1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ZABIAN R. CROSBY, | ) | 1:09-cv-01764 GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S SOCIAL** |
| | ) | **SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **BACKGROUND**

Plaintiff Zabian R. Crosby ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 7 & 9.)

1

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for disability insurance and supplemental security income benefits on January 14, 2005, alleging disability beginning August 7, 2002.  AR 102-107, 589-592.  Plaintiff's application was denied initially and upon reconsideration.  AR 87-99.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 83.  On March 23, 2007, ALJ William C. Thompson Jr. held a hearing and issued an order regarding benefits on June 29, 2007, finding Plaintiff was not disabled.  AR 52-65, 692-716.  On August 13, 2009, the Appeals Council denied review.  AR 5-8.

**Hearing Testimony**

ALJ Thompson, via videoconference from Stockton, held a hearing on March 23, 2007.  Plaintiff personally appeared and testified in Fresno, and was represented by attorney Richard Hudnell.  Vocational Expert ("VE") Susan Creighton-Clavel also testified via telephone.  AR 692-716.

Plaintiff was born on May 19, 1975, and thus was thirty-two years old on the date of the hearing.  AR 696.  He is five feet, ten inches tall, weighs 127 pounds, and is right handed.  AR 696-697.  Plaintiff is single and does not have any children.  He lives as a roommate in someone's home; the home does not belong to a friend or relative.  AR 697.  He has a valid California driver's license and continues to drive.  AR 703.

Plaintiff relies upon a monthly pension from the Veterans Administration ("VA") for income.  AR 697.  Plaintiff is considered twenty percent disabled due to a tear in the meniscus of his left knee, and has received the VA disability pension since January 2006.   AR 697.

Following high school, Plaintiff graduated from Devry University with a degree in computer information systems.  AR 696.  When he was asked about the last time he worked, Plaintiff indicated he last worked at boot camp in the United States Navy.  He did not finish basic

---

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  training and was medically discharged primarily as the result of the knee injury.  AR 698; *see*

2  *also* AR 708.  He was discharged from the Navy in November 2004.  AR 709.

3      Obtaining all of his medical care at the VA hospital in Fresno, Plaintiff is being treated

4  for asthma, hypertension, fibromyalgia, his left knee, depression, obsessive compulsive disorder,

5  obsessive compulsive personality disorder, irritable bowel syndrome and agoraphobia.  AR 698.

6  He sees a primary care provider and a psychiatrist.  AR 698.  With regard to the treating

7  psychiatrist, Plaintiff sees the doctor once a month, and more if the doctor believes he needs

8  additional treatment.  Plaintiff receives counseling and medication.  AR 699.  He began seeing

9  the psychiatrist in July or August of 2005.  He is currently prescribed Wellbutrin, Zoloft, and

10  Quetiapine, and indicated that he continues to experience symptoms of his mental difficulties.

11  AR 699.

12      Specifically, Plaintiff continues to feel nervous and anxious.  He does not feel

13  comfortable being around others, feels as though "something bad is imminent or about to

14  happen," has low self esteem, and is depressed.  AR 699-700.  Plaintiff identifies his depression

15  as his most significant illness affecting his daily life.  AR 707.  Because of the medications he

16  has been prescribed, "some days" he feels better, but for the most part, he continues to struggle.

17  AR 700.  The side effects of the medications involve bouts of uncontrollable shaking and tremors

18  in his hands.  He has lost the ability to focus and concentrate, and he is not motivated.  AR 700.

19  About three times a week he does not have the motivation to even get out of bed.  When he was

20  asked about the other four days in the week, Plaintiff indicated that he manages to get up and

21  tend to hygiene matters and straightening up, but a few hours later he feels weak and tired again.

22  If he is sitting down, he'll then lie down and sleep for about two or three hours before getting up

23  again.  AR 700.

24      The VA is treating Plaintiff's left knee with pain medication - cyclobenzaprine - as

25  needed.  The pain is not persistent throughout the day, however, it is painful on a daily basis.  He

26  tries to take the pain medication infrequently because it makes him "feel extremely groggy, to the

27  point [he] cannot even stand up straight."  AR 700-701.  He has never had surgery on the knee,

28  nor has he had injections.  He has occasionally used a knee brace, but the use is sporadic.  AR

701.  When he was asked how far he could walk, Plaintiff indicated he could walk for "a few minutes . . . maybe five minutes."  AR 701.  After five minutes, he would become tired, get short winded from the asthma, and his knee pain would worsen.  AR 701-702.

Asthma is a problem with physical activity.  Plaintiff indicated that the more he does, the sicker he gets.  Additionally, the asthma is triggered by emotional factors, such as stress and anxiety.  It can also lead to a panic attack such as the one he suffered the previous year.  AR 702.  Plaintiff estimated his asthma is a problem about three or four times a month.  He uses two inhalers, but does not use a nebulizer as one has never been prescribed.  AR 702.

With regard to his ability to stand for a period of time, Plaintiff indicated he can stand for ten to fifteen minutes before he begins to feel weak and light headed.  AR 702.  He can sit for about thirty to forty-five minutes before becoming tired and weak.  AR 702-703.  Plaintiff tries to pass the time by watching television, but can only do so for an "hour or so."  He can read for about fifteen to twenty minutes before having trouble focusing and concentrating.  AR 703.  When asked the heaviest weight he could lift, Plaintiff indicated between five and ten pounds.  He has never been physically strong and stated his "general weakness would prevent [him] from lifting anything heavier."  AR 703.  Additionally, his knee problem would prevent him from attempting to lift anything heavy.  AR 703.

Plaintiff does not cook.  He buys frozen dinners during his once a month grocery shopping trip.  AR 703.  He does not buy a gallon of milk because it is too large and heavy.  He will buy a half gallon or less, and he asks the clerk to place the groceries in his car.  AR 704.  Pushing the grocery cart causes him pain in his leg, knee and arms.  AR 704.

Following a diagnosis of fibromyalgia, Plaintiff's doctor prescribed cyclobenzaprine.  It "only helps when [he] immediately takes the medicine."  When it wears off, the pain continues throughout the day, and when he is anxious or nervous, Plaintiff feels pain in his chest and neck.  He also feels "pressure on the top of [his] eyes."  AR 704.

Following a question by his attorney, Plaintiff indicated his weight has fluctuated in the last few months; he would like to gain weight but he has been unable to do so.  AR 705.  He understands that his doctor attributes the weight fluctuation to stress and anxiety.  Plaintiff said

he will "just have bouts of depression and [he] won't eat for days." AR 705.  Specifically, Plaintiff becomes anxious when people mistreat him.  This has occurred in the workplace and continues to occur and is the reason he moves every three or four months. AR 705.  He has explained to his roommates that he is not healthy and needs peace and quiet, and that he does not wish to be around a lot of people and noise, however, "that's what ends up happening" and he cannot relax.  AR 705-706.

When he was asked about family or friends he sees on a social basis, Plaintiff indicated that his family has abandoned him as a result of their religious beliefs.  He was raised Jehovah's Witness, and as the result of mistreatment "there in the religion" he decided to leave it in 2001.  Following his decision, his family refuses to speak with him.  His mother, his brother and his sister do not have any contact with him.  His father has passed away.  AR 706-707.  He has tried to make friends at church, but it does not work out.  Plaintiff does not socialize with anyone.  AR 706.

With regard to his obsessive compulsive disorder, Plaintiff indicated that things must be done "in a certain order" or he cannot "think straight" and function.  He cannot manage his bank account "with dollars and cents . . . everything has to be in whole numbers." AR 707.

Plaintiff indicated that at one point he believed he was having a heart problem because the pain was so bad.  He sought treatment at the VA and was advised he did not have a heart attack, but the concentrated pain he feels in his chest - a sharp pain as if someone is cutting him - is related to fibromyalgia.  AR 707.  The pain spreads to the bottom of his neck and causes the pressure he feels "on the top of [his] eyes."  AR 707-708.

Sleep is a problem because even if Plaintiff takes the medication he cannot stop having "thoughts" of people talking about him and calling him names, and of the wrongs people and his family have done to him.  AR 708.  When he was asked whether the medications he has been prescribed for anxiety and depression have helped, Plaintiff indicated that they "help a little bit" however "the underlying problem" remains.  AR 708.

Prior to entering the Navy, Plaintiff worked as an administrative assistance at Earth Tech for about a year.  Prior to that position, he worked for county government for about eight months,

and also worked for GE Capital for about six months.  He has never held a job for longer than a year.  AR 709.  In the last ten years, he has probably had ten jobs.  AR 709.  After six to nine months Plaintiff is terminated and indicated that he is never given a specific reason for the termination.  AR 709.  Plaintiff does not believe he can hold a job now because he still suffers from anxiety and nervousness.  Being in an office makes him "nervous and jittery wondering what people are thinking about" him.  AR 710.  He just does not feel comfortable being around others, and would prefer to be by himself.  AR 710.

VE Susan Creighton-Clavel was asked to consider a hypothetical worker of the same age and education as Plaintiff.  The hypothetical worker had no exertional limitations but was to avoid excessive amounts of dust, fumes, smoke and other respiratory irritants.  The worker was limited to simple instructions, and was to have restricted contact with the public and coworkers.  The worker could work in the presence of others, but was not to be a part of a work team.  AR 712.  The VE indicated that such an individual could perform simple unskilled jobs.  AR 712-713.  For example, the hypothetical worker could work as: (1) a laundry classifier in a laundromat, Dictionary of Occupational Titles ("DOT") number 361.687-014, light, specific vocational preparation ("SVP") of 2, with over 17,000 positions in California and over 153,000 nationally; (2) a can filling machine operator, DOT 529.685-282, light SVP of 2, with over 7,000 positions in California and over 79,000 nationally; (3) an investigator for dealer accounts, DOT 241.367-038, light, SVP of 2, with over 5,000 positions in California and 37,000 nationally; (4) a mail clerk, DOT 209.687-026, light SVP of 2, with over 7,800 positions in California and over 60,000 nationally; and (5) a small parts assembler, DOT 706.684-022, light, SVP of 2, with over 33,000 positions in California and over 350,000 nationally.  The VE's testimony is consistent with, and did not depart from, the DOT.  AR 713.

In a second hypothetical, the VE was asked to assume a hypothetical worker of Plaintiff's same age and education who is restricted to lifting ten pounds occasionally, to standing and walking not more than thirty minutes at a time with no more than two hours standing and walking in a workday, and whom could sit without restriction, including the same non-exertional limitations provided in the first hypothetical.  AR 713-714.  The VE indicated such an individual

could perform sedentary, unskilled work.  For example, electronics assembly, DOT 687-030[3],

sedentary, SVP of 2, with over 5,000 positions in California and over 56,000 nationally;

telephone clerk, DOT 237.367-046, sedentary, SVP of 2, with over 12,000 positions in California

and over 93,000 nationally; and pharmaceutical laborer, DOT 559.687-014, sedentary, SVP of 2,

over 1,800 positions in California and over 12,000 nationally.  AR 714.

Plaintiff's attorney asked the VE to consider hypothetical worker number one with a

limitation that the worker may miss work more than three times a month.  The VE responded that

such a worker could not perform any of the work previously identified.  AR 714-715.

Additionally, the VE was asked to consider the second hypothetical worker with the same

limitation.  Again, the VE responded that such a worker could not perform the work previously

identified.  AR 715.  Lastly, the VE was asked to consider Plaintiff's physician's fibromyalgia

impairment questionnaire wherein the doctor indicates Plaintiff has "bilateral impairments" in

the cervical spine, shoulders, arms, hands, fingers, hips, legs, knees, ankles and feet, preventing

him from even "occasional movements."  The VE indicated such a worker could not perform of

any of the work previously identified.  AR 715.

**Medical Record**

The entire medical record was reviewed by the Court, however, only those medical

records relevant to the issues on appeal will be addressed below as needed in this opinion.

**ALJ's Findings**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since

August 7, 2002, and had the severe impairments of an obsessive-compulsive disorder, a

psychotic disorder, not otherwise specified, and a torn meniscus of the left knee.  AR 54-55.

Nonetheless, the ALJ determined that none of the severe impairments met or exceeded one of the

listing impairments.  AR 55.

Based on his review of the medical evidence, the ALJ determined that, Plaintiff had the

RFC to perform work as follows:

---

[3] It appears the DOT code is incomplete and/or was inaccurately transcribed for this job description.

1
2
3
4
5

> I find the claimant has the residual functional capacity to perform work without exertional limitations.  The claimant would be required to avoid concentrated exposure to respiratory irritants such as fumes, dust, smoke, gasses, vapors, temperature extremes, or high humidity.  The claimant is limited to performing no more than the simple and repetitive tasks characteristic of unskilled work.  The claimant is precluded from contact with the general public.  The claimant is able to work in the presence of coworkers, but is precluded from being part of a work team or cooperative work process.

6   AR 55.  The ALJ found that Plaintiff could not perform any past relevant work.  AR 63.

7   Nevertheless, the ALJ determined that Plaintiff had the RFC to perform other jobs that exist in

8   significant numbers in the national economy.  AR 63-65.

9                                   **SCOPE OF REVIEW**

10       Congress has provided a limited scope of judicial review of the Commissioner's decision

11   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

12   this Court must determine whether the decision of the Commissioner is supported by substantial

13   evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

14   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

15   *Weinberger*, 514 F.2d 1112, 1119, n.10 (9th Cir. 1975).  It is "such relevant evidence as a

16   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

17   401.  The record as a whole must be considered, weighing both the evidence that supports and

18   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

19   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

20   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

21   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

22   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

23   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

24   Cir. 1987).

25                                        **REVIEW**

26       In order to qualify for benefits, a claimant must establish that he is unable to engage in

27   substantial gainful activity due to a medically determinable physical or mental impairment which

28   has lasted or can be expected to last for a continuous period of not less than twelve months.  42

1   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

2   such severity that he is not only unable to do her previous work, but cannot, considering his age,

3   education, and work experience, engage in any other kind of substantial gainful work which

4   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

5   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

6   Cir. 1990).

7          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

8   regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

9   (C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ

10  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

11  his disability; (2) has an impairment or a combination of impairments that is considered "severe"

12  based on the requirements in the Regulations (20 CFR §§ 404.1520(c) & 416.920(c); (3) does not

13  have an impairment or combination of impairments which meets or equals one of the

14  impairments set forth in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) was unable to perform

15  any past relevant work; yet (5) retained the RFC to perform other jobs that exist in significant

16  numbers in the national economy.  AR 54-65.

17         The Court has construed Plaintiff's arguments to include the following: (1) the ALJ erred

18  in considering the medical opinions of various medical sources; (2) the ALJ erred by failing to

19  develop the record with regard to Plaintiff's mental impairments; and (3) the ALJ erred regarding

20  Plaintiff's pain complaints and his credibility.  (Doc. 21 at 10-17.)

21

22

23

24

25

26

27

28

## DISCUSSION[4]

### *The ALJ's Consideration of the Medical Opinion Evidence*

Plaintiff argues that the ALJ failed to properly consider the opinions of treating physicians Kator and Raroque.  Defendant contends no error occurred.

### 1.    Applicable Legal Standards

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

---

[4] Plaintiff is representing himself in these proceedings.  The Court reviewed both his opening brief and his reply brief and has construed those pleadings to assert the arguments discussed here.  To the degree the Court will not reference every assertion in the organizational manner presented by Plaintiff, he is advised the Court has carefully reviewed and considered all of the pleadings.  Any omission of a reference to a specific argument or pleading is not to be construed that the Court did not consider the argument in reaching its determination.

1    The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence

2    that justifies the rejection of the opinion of either an examining physician or a treating physician.

3    *Pitzer*, 908 F.2d at 506 n.4; *Gallant*, 753 F.2d at 1456.  In some cases, however, the ALJ can

4    reject the opinion of a treating or examining physician, based in part on the testimony of a

5    nonexamining medical advisor.  *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.

6    1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995).  For example,

7    in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician,

8    "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of

9    Magallanes's treating physicians . . .."  *Magallanes*, 881 F.2d at 752.  Rather, there was an

10   abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test

11   results, on contrary reports from examining physicians, and on testimony from the claimant that

12   conflicted with her treating physician's opinion.  *Id*. at 751-52.

13              **2.    ALJ Thompson's Summary of the Opinions at Issue**

14        ALJ Thompson considered the relevant medical evidence as follows, in pertinent part:

15             On May 7, 2005, the claimant presented for a consultative examination []
         performed by board-certified psychiatrist Dr. Ekram Michiel.  The claimant's
16       affect was noted to be "slightly intense," and his thought process was goal
         directed and guarded.  His thought content was described as "delusional with
17       paranoid persecutory ideations."  Following the examination Dr. Michiel's
         diagnosis was a psychotic disorder, NOS, and he assigned the claimant a GAF[5]
18       scale score of 55-60 - indicating moderate symptoms such as having a flat affect,
         circumstantial speech, or occasional panic attacks; or having moderate difficulty
19       in social, occupation, or school functioning such as having few friends or having
         conflicts with peers or co-workers.  Dr. Michiel opined that the claimant would be
20       capable of understanding, remembering, and carrying out the simple and repetitive
         1-2 step tasks characteristic of unskilled work; and capable of maintaining
21       adequate attention, concentration, persistence, and pace in the performance of
         such simple and repetitive tasks.  Dr. Michiel further opined that the claimant
22       would also be able to relate and interact appropriately with supervisors,
         coworkers, and the general public.
23             On May 15, 2005 the claimant presented for a consultative examination
         which was performed by board-certified internist Dr. Steven Stoltz.  Aside from
24       Dr. Stoltz's noting the claimant's poor eye contact, anxious affect, and some
         reported mid-abdominal tenderness, the claimant's examination was entirely

25

26             [5]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's
         overall level of functioning.  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental*
27       *Disorders* 30 (4th ed. 2000) ("DSM IV").  The Commissioner has determined the GAF scale "does not have a direct
         correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."  65 Fed.
28       Reg. 50,746, 50,765 (Aug. 21, 2000).

unremarkable. There were no abnormalities noted on musculoskeletal examination. Following the examination Dr. Stoltz opined that the claimant would have no exertional limitations. Dr. Stoltz believed the claimant's anxiety disorder was responsible for the majority of his complaints.

On June 28, 2005 state agency medical consultant board-certified psychiatrist Dr. Archimedes Garcia, after reviewing all of the evidence present in the case record as of that date, opined that the claimant would have mild to moderate restriction of his ability to understand, remember, and carry out detailed instructions; and of his ability to interact appropriately with the general public. The claimant would have no other significant limitation as result of his mental impairments.

On July 12, 2005 state agency medical consultant Dr. James Glaser, a board-certified specialist in allergy and immunology, after reviewing all of the evidence present in the case record as of that date, opined that the claimant's combined asthma and meniscal tear of the left knee resulted in only the need to avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases, and poor ventilation.

On October 20, 2005 the claimant presented to his primary care physician Dr. Steven Kator at the VA in Fresno for "follow-up for disability" due to severe tension, preoccupation, and worry. Dr. Kator noted that the claimant gave him a large packet of letters and lists which he had created himself "documenting" his inability to get or keep a job. The claimant complained of left knee pain at 5/10 in intensity with ambulation. He also complained that his left leg caused pain daily and that the pain was worse during cold-weather. However, Dr. Kator's examination revealed only diffuse tenderness throughout the shoulder girdle and abdomen, as well as tenderness to palpation at the lateral epicondyles and trochanteric bursae of the left knee. The claimant was noted to be hyperverbal, maintain poor eye contact, and have an anxious affect and pressured speech. Following the examination Dr. Kator reported that the claimant's physical problems were chronic left knee pain and asthma, which were essentially stable. However, Dr. Kator's primary diagnosis was a personality disorder, and suspect[ed] obsessive-compulsive disorder; in addition to the claimant's minor physical impairments of chronic left knee pain, the mild intermittent asthma, allergic rhinitis, hypertension, [and] irritable bowel syndrome. Despite the lack of any clinical evidence of fibromyalgia, subjective complaints by the claimant characteristic of the condition, or discussion as to the basis of his impression Dr. Kator listed fibromyalgia seventh in the claimant's list of diagnoses.

. . . However, here the record contains no indication that the thorough testing indicated by the American College of [R]heumatology as necessary for a diagnosis of fibromyalgia was ever performed. Nor do treatment notes indicate that true fibromyalgia tender points were ever present during examination. Nor do treatment notes indicate that the [claimant] consistently complained of the chronic severe diffuse musculoskeletal pain characteristic of fibromyalgia. Finally, as outlined above, de[spite] being asked on several occasions during the hearing concerning the location [and] intensity of his pain the claimant did not testif[y] to the presence of the severe diffuse musculoskeletal pain of fibromyalgia. The record does not contain objective medical evidence to support a finding that the claimant suffers from fibromyalgia.

On October 20, 2005 the claimant was referred by his primary care physician to VA psychologist Dr. Geoffrey Twitchell, Ph.D. The claimant complained primarily of difficulty maintaining employment due to harassment by supervisors which he stated always occurred despite his good job performance. He reported that his conflict with supervisors and coworkers would always begin when they would complain that he is "too tidy, neat, and generally not like others;" and that increasing conflict with supervisors and coworkers would

eventually lead to his termination.  The claimant also complained of side effects from prescribed medications . . ..  The claimant presented as alert, oriented, and meticulously dressed.  Dr. Twitchell noted that the claimant was perseverative, and communicated in what could be described as "an automated robotic way, over-controlled and overly methodical [and] with hostility present."  The claimant reported severe anxiety, which he dealt with by compulsive behavior.  Following the examination Dr. Twitchell diagnosed the claimant with an obsessive-compulsive disorder, depression, and rule out obsessive-compulsive personality disorder.  He assigned the claimant [a] GAF scale score of 50, indicating severe symptoms, and recommended supportive therapy.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Updated treatment notes from the Veterans Administration covering the period between October 20, 2005 and March 15, 2007 document the claimant's continued receipt of conservative treatment for asthma and diabetes which were well-controlled with prescribed medications, and for left knee pain which was stable with conservative treatment and did not require surgical intervention.  They also document the claimant's treatment for complaints of anxiety, depression, and obsessive-compulsive symptomatology which were also significantly improved with prescribed [medications].

On June 22, 2006 Dr. Roy M. Raroque, the claimant's treating psychiatrist since November 2005, who examine[d] the claimant on four occasions between November 2005 and May 25, 2006, prepared a statement . . . indicating an opinion that the claimant had "not made much progress in his obsessive-compulsive disorder and depressive disorder" and would as a result be unable to maintain gainful employment for the next several months.  Dr. Raroque opined that the claimant would be unable to resume employment "by November 2005(sic) one year since I first examined him," presumably referring instead to November 2006.  Dr. Raroque generally opined that the claimant had not made much progress with his obsessive-compulsive disorder, and had difficulty tolerating prescribed antidepressants.

On March 6, 2007 Dr. Raroque responded to a "checkmark-the-box" and "fill-in-the-blank form" supplied by the claimant's attorney and styled a psychiatric/psychological impairment questionnaire.  Dr. Raroque elected not to respond to several specific questions asking the degree of limitation the claimant had in performing several of the basic mental demands of competitive remunerative work - such as his ability to understand, remember, and carry out the simple and repetitive 1-2 step instructions characteristic of unskilled work; his ability to relate appropriately to supervisors, coworkers, and the general public; and of his ability to adapt to changes in a routine work setting.  Dr. Raroque responded only [to] questions generally indicating an opinion that the claimant would be incapable of performing even low stress jobs [due to] obsessive/compulsive symptomatology including "rigidity seriously affect[ing] his ability to handle work routine," as well as a severe recurrent major depressive disorder without psychosis according to the claimant['s] reported history.

However, I note that the most recent treatment notes from Dr. Raroque indicate that the claimant's obsessive-compulsive symptoms responded very well to prescribed medications.  On June 5, 2006 the claimant reported a good response and prescribed sertraline, but also noted the unwanted side effect of erectile dysfunction (ED).  As a result, the claimant was tried first on a combination of sertraline and bupropion, but this still produced unwanted side effects.  Eventually, the claimant began taking only bupropion and by October 17, 2006 reported feeling "remarkably better" with reduced stress, good appetite, and the claimant reporting that he is active in his church community.

On March 15, 2007 Dr. Kator, the claimant's primary care physician since June 9, 2005, prepared responses to a "checkmark-the-box" and fill-in-the-blank"

form supplied by claimant's attorney and styled a "Fibromyalgia Impairment Questionnaire." Dr. Kator checked the box indicating that the claimant met the "American Rheumatological criteria" for fibromyalgia, and stated that the claimant had positive clinical signs including tender points in the bilateral occiput, trapezii, levator scapulae, lumbar paraspinal muscles, trochanters, anserine bursae, "and other places." When asked about the location of the claimant's pain, Dr. Kator checked every box available, indicating that the claimant had pain in the bilateral lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands/fingers, hips, legs, and his knees/ankle/feet. Dr. Kator indicated an opinion that the claimant would be limited to lifting and carrying no more than 5 pounds occasionally, to sitting no more than 30 minutes at one time and no more than 4 hours total in an 8-hour workday, and to standing and walking less than one-hour total in an 8-hour workday. Dr. Kator further opined that the symptoms and limitations established by his responses to the fibromyalgia impairment questionnaire had been present since July 2002 despite the fact that he [had] only been treating the claimant since June of 2005.

I find it revealing that Dr. Kator opined that the extreme limitations he prescribed have been present since July 2002 - more than three years prior to the date he first examined the claimant. It is also noteworthy that Dr. Kator's progress notes do not contain any indication that he performed a thorough fibromyalgia examination according to the criteria indicated by the American College of Rheumatology. Rather, Dr. Kator's responses indicate that the claimant simply endorsed pain everywhere, and the[n] Dr. Kator accepted his subjective complaints of tender points throughout his body. This conclusion is also supported by the claimant's testimony during the hearing. The claimant was asked about the location and severity of his pain, and did not even complain of the chronic diffuse musculoskeletal pain indicative of fibromyalgia, and which Dr. Kator's responses to the "Fibromyalgia Impairment Questionnaire" indicated that he suffers from "every day." All of these facts support the conclusion that Dr. Kator was basing his responses largely on the claimant's own subjective statements and complaints of pain. As mentioned above, I find that the claimant subjective complaints and statements concerning the resulting limitations are not generally credible. I further find that the claimant's subjective complaints to Dr. Kator were directly contradicted by his testimony during the hearing.

I have weighed the medical opinion evidence present in the case record and find that the opinions of examining physicians Dr. Stoltz and Dr. Michiel and of the state agency medical consultants are mutually supporting, well supported by the evidence in the case record as a whole, and not inconsistent with other substantial evidence. They are therefore accorded the greatest weight.

As outlined above, I accord[] little to no weight to the opinions of Dr[s]. Kator and Raroque because Dr. Kator's report is directly contradicted by the claimant's testimony during the hearing - where he did not indicate any fibromyalgia related pain; and because Dr. Raroque's report is contradicted by his own progress notes - which indicate that the claimant reported a good response [to] prescribed medications. I find that these opinions are also contradicted by substantial evidence present in the record consisting chiefly of the claimant's own subjective statements made elsewhere in the record concerning his physical capabilities and daily activities and by his testimony at the hearing concerning his symptoms and limitations.

As mentioned above, the claimant did not complain at all during his testimony at the hearing of fibromyalgia symptomatology - directly contradicting the findings indicated by Dr. Kator in his statement dated March 15, 2007. Dr. Kator's limitations are also contradicted by the claimant's acknowledgment during his testimony at the hearing that his current exertional limitations, aside from those he attribut[ed] to his knee injury during Navy basic training, were the

result of his general weakness and had been present "all his life."  The claimant's
testimony during the hearing acknowledges that his exertional limitations are [the]
result of deconditioning and body habitus rather than fibromyalgia or any other
medically determinable impairment.
          Similarly, the claimant's own statements to his doctors contained in the
medical record - which acknowledge that his anxiety, depression, and obsessive
compulsive symptoms are well controlled with prescribed medications; and that
he is active in his church community and has healthy interpersonal relationships -
directly contradict the opinion of Dr. Raroque indicating that the claimant suffers
from much more significant limitations.

AR 58-62, internal citations omitted.

Here, the ALJ did not err.  The treating physician opinions were contradicted by the

opinions of both the examining physicians and state agency physicians.  Thus, ALJ Thompson

had to provide specific and legitimate reasons for discounting the treating physician opinions.

*See Lester*, 81 F.3d at 830.   In fact, the ALJ gave a variety of specific and legitimate reasons for

affording the opinions of Drs. Raroque and Kator less weight.  More specifically, ALJ Thompson

explained that the opinion of treating physician Dr. Raroque was contradicted by the doctor's

own record (*Lingenfelter v. Astrue*, 504 F.3d 1028), was based upon Plaintiff's own subjective

complaints (*Morgan v. Commissioner of Social Sec. Admin*., 169 F.3d at 602; *Thomas v.*

*Barnhart,* 278 F.3d at 957; *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989), and was also

contradicted by Plaintiff's testimony at the hearing (*Magallanes*, 881 F.2d at 751-752).  All of

these reasons are specific and legitimate.  Next, ALJ Thompson indicated that he afforded the

opinion of Dr. Kator less weight because it too lacked objective medical findings in support of

the doctor's opinion, was based upon Plaintiff's subjective complaints, and was contradicted by

Plaintiff's hearing testimony.  Again, the ALJ provided specific and legitimate reasons for

discounting Dr. Kator's opinion.

Additionally, the examining physician opinions here are substantial evidence as those

opinions are based upon independent clinical findings.  *Orn v. Astrue*, 496 F.3d 625, 632 (9th

Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Miller v. Heckler*, 770

F.2d at 849.  Thus, Dr. Michiel's opinion (AR 282-285) and Dr. Stoltz's opinion (AR 296-301)

are substantial evidence.  Morever, a statement by a physician indicating a claimant is "disabled"

does not mean that the Secretary will concur, absent review of medical findings and other

1  evidence.  20 C.F.R. 416.927(e).  "Conclusory opinions by medical experts regarding the

2  ultimate question of disability are not binding on the ALJ." *Nyman v. Heckler*, 779 F.2d 528 (9th

3  Cir. 1985).

4      With specific regard to Plaintiff's assertion that the ALJ committed error by failing to

5  "either accept or reject [physician] findings as a whole" (Doc. 26 at 15), Plaintiff is advised that

6  an ALJ need not believe everything a physician sets forth, and may accept all, some, or none of

7  the physician's opinions. *Magallanes*, 881 F.2d at 753-754.

8      A VA disability rating does not compel the Social Security Administration to reach an

9  identical result. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  However, the

10  ALJ must consider the VA's findings in reaching a decision.  *Id.*  In fact, an ALJ "must ordinarily

11  give great weight to a VA determination of disability" because of the similarities of the two

12  federal programs.  *Id.*  The ALJ may give less weight to a VA disability rating if he "gives

13  persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*  Here, ALJ

14  Thompson considered the VA disability rating in reaching his decision.  Moreover, the ALJ

15  provided a persuasive, specific and valid reason for assigning the VA disability rating less

16  weight, to wit: the rating was "based significantly on claimant's own subjective complaints . . .."

17  AR 62-63.

18      In sum, the ALJ did not err by affording Plaintiff's treating physicians' opinions less

19  weight, in favor of the opinions of both the examining physicians and state agency physicians.

20      ***Duty to Develop the Record***

21      To the degree Plaintiff can be understood to assert a claim that the ALJ erred in

22  developing the record, the Court is not persuaded.

23      It is Plaintiff's burden to produce full and complete medical records, rather than the

24  Commissioner's.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  However, when the

25  evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the

26  evidence, the ALJ has a duty to develop the record.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150

27  (9th Cir. 2001).  The ALJ may discharge this duty in one of several ways, including subpoenaing

28  claimant's doctors, submitting questions to claimant's physicians, continuing the hearing, or

1   keeping the record open after the hearing to allow supplementation of the record.  *Id.*

2   Nonetheless, a duty to fully and fairly develop the record arises only when the evidence is

3   ambiguous or the record is inadequate.  *Id.*

4        Here, the evidence was neither ambiguous nor incomplete.  *Tonapetyan v. Halter*, 242

5   F.3d at 1150.  The medical record is clear and complete.  In fact, Plaintiff's counsel at the

6   administrative hearing ensured the record would remain open pending receipt of additional

7   medical records.  *See* AR 695-696.  Those records were subsequently received and considered by

8   the ALJ.  AR 60-62.  The fact that the ALJ found certain medical records to be inconsistent with

9   others does not implicate a duty to further develop the record.  Therefore, ALJ Thompson had no

10  duty to develop the record or re-contact certain physicians, and thus, no error occurred.

11  ***ALJ's Findings Regarding Plaintiff's Credibility & Subjective Complaints***

12       Finally, to the degree Plaintiff argues the ALJ erred in assessing his credibility and

13  subjective complaints of pain (Doc. 23 at 37-38), the Court finds no error.

14  **1.      Legal Standards**

15       A two step analysis applies at the administrative level when considering a claimant's

16  credibility.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).  First, the claimant must

17  produce objective medical evidence of an impairment that could reasonably be expected to

18  produce some degree of the symptom or pain alleged.  *Id.* at 1281-1282.  If the claimant satisfies

19  the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony

20  regarding the severity of his symptoms only if he makes specific findings that include clear and

21  convincing reasons for doing so.  *Id.* at 1281.  The ALJ must "state which testimony is not

22  credible and what evidence suggests the complaints are not credible."  *Mersman v. Halter*, 161

23  F.Supp.2d 1078, 1086 (N.D. Cal. 2001), quotations & citations omitted ("The lack of specific,

24  clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for

25  [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence");

26  Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific to make

27  clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

28  individual's statements and reasons for that weight").

1    An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

2    *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

3    reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

4    testimony by the claimant that appears less than candid, unexplained or inadequately explained

5    failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

6    activities, claimant's work record, or the observations of treating and examining physicians.

7    *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d at 638.

8    The ALJ is required to make specific findings assessing the credibility of plaintiff's

9    subjective complaints.  *Ceguerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991). In rejecting

10   the complainant's testimony, "the ALJ must identify what testimony is not credible and what

11   evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d at 834 (quoting

12   *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).

13   "Despite the inability to measure and describe it, pain can have real and severe

14   debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

15   working." *Fair v. Bowen*, 885 F.2d at 601.  It is possible to suffer disabling pain even where the

16   degree of pain is unsupported by objective medical findings.  *Id*.  "In order to disbelieve a claim

17   of excess pain, an ALJ must make specific findings justifying that decision." *Id*. (citing

18   *Magallanes v. Bowen*, 881 F.2d at 755).  The findings must convincingly justify the ALJ's

19   rejection of the plaintiff's excess pain testimony.  *Id*. at 602.  However, an ALJ cannot be

20   required to believe every allegation of disabling pain.  "This holds true even where the claimant

21   introduces medical evidence showing that he has an ailment reasonably expected to produce

22   some pain."  *Id*. at 603.

23   Once a claimant produces medical evidence of an underlying impairment likely to cause

24   the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely

25   because the evidence does not support plaintiff's statements.  *Lester*, 81 F.3d at 834 (citing

26   *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (*en banc*)).  In this case, the ALJ did not

27   ignore or reject Plaintiff's testimony solely because it was unsupported by objective evidence.

28

## 2. ALJ Thompson's Assessment

ALJ Thompson assessed Plaintiff's credibility and subjective pain complaints, in relevant part, as follows:

> . . . I note that the claimant specifically denied any history of significant medical problems with musculoskeletal pain, weakness, difficulty breathing, anxiety, depression, or other mental impairment in materials submitted in connection with his enlistment into [the] United States Navy. I also note that, during his five months in basic training, the claimant's commanding officers and treating physicians observed no serious difficulty on the part of the claimant with diffuse musculoskeletal pain, weakness, asthma, depression, anxiety, or obsessive/compulsive behavior. As outlined more fully below, each of these facts erodes the claimant's later subjective statements that he was disabled as a result of the serious symptoms . . . since August of 2002.
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> The claimant has generally alleged disability since August 7, 2002 due to asthma, anxiety, and obsessive compulsive symptomatology which made it difficult for him to maintain regular attendance, relate appropriately to others, and sustain employment. The claimant also alleged knee pain and difficulty with prolonged standing and walking since sustaining an injury during United States Navy basic training in May of 2004.
> In materials submitted in support of a prior disability claim, the claimant reported frequent illnesses which limited him to 2 hours of work per day; inability to stand for more than 15 minutes without need for rest, inability to sit for more than 30 minutes without a need to lie down, inability to walk more than 20 feet without a need for rest, and inability to lift more than 3 pounds - and only for a limited duration - due to general fatigue and weakness; constant pain in the left leg and chest; constant numbness in the extremities; and inability to maintain attendance as a result of health problems and doctor visits.
> The claimant testified at the hearing that he is unable to work due to chronic left knee pain, general fatigue and weakness, left knee pain, and side effects of medications which make him extremely groggy. He testified that he is only able to walk a few blocks or stand for 10 minutes due to fatigue, asthma, and pain in his left knee. He is able to sit no more than 30-45 minutes due to fatigue and weakness. He is able to lift no more than 5-10 pounds due to general weakness which has been present "essentially all his life." The claimant did not make any mention at all of severe and diffuse body pain when describing his symptoms and exertional limitations, but only complained of fatigue, general weakness, and knee pain.
> The only mention made by the claimant at all during the hearing of significant musculoskeletal pain - aside from lower extremity pain with prolonged walking since his knee injury - occurred at one point during the hearing when questioned by his attorney about his experiences when he goes shopping. The claimant testified that he is unable to push a shopping cart for very long due to pain in his legs, knees, and arms; and due to episodic anxiety and nervousness with associated chest pain, neck pain, and pain over his eyes.
> The claimant's testimony during the hearing demonstrates that his primary complaints are of left knee pain and significant panic/anxiety; and not the diffuse and severe musculoskeletal pain and fibromyalgia. The claimant also acknowledged during his testimony that the general weakness he alleges which [] prevents him from lifting heavy objects has been present throughout his life and is simply the result of his general body habitus rather than the result of any medically determinable impairment.

1

2          After considering the evidence of record, I find that the claimant's
    medically determinable impairments could reasonably be expected to produce []
    most of the symptoms he alleges, but that the claimant's statements concerning
3   the intensity, persistence and limiting effects of these symptoms are not entirely
    credible.  In reaching this conclusion, I have considered the claimant's subjective
4   complaints; the lack of consistency between the claimant's statements made to his
    physicians and contained in the record, statements made in materials submitted in
5   connection with his application for benefits, and statements made during his
    testimony during the hearing; the inconsistent statements made by the claimant in
6   connection with his enlistment into the United States Navy in 2004; the absence
    of clinical signs and laboratory findings in the case record, the absence of
7   longitudinal records showing regular contact with physicians or attempts to obtain
    relief through the trial of a variety [of] different treatment modalities without
8   reasonable or credible explanation despite complaints of disabling symptoms; the
    conflicting opinion[s] of physicians attending the claimant during his enlistment
9   with the United States Navy in 2004 indicated that the claimant - aside from his
    knee injury - was otherwise fit for service; the conflicting medical opinions of the
10  examining and nonexamining physicians in the record; the claimant's failure to
    follow through with recommended treatment to address his left knee problem
11  without reasonable or credible explanation despite complaints of severe left knee
    pain and limitation.
12         The claimant's medical record is notable only for a history of mild asthma
    - well controlled with medications including Albuterol and Flovent; hypertension,
13  under suboptimal control; and a history of anxiety or panic attacks.
           Despite these impairments, the claimant was able to work fairly regularly
14  until August of 2002, when he lost his job as an administrative assistance for an
    environmental company.  The claimant was then unable to secure employment
15  between August of 2002 and May of 2004 when he entered the United States
    Navy as a seaman recruit.  In materials submitted in connection with his
16  application into the Navy the claimant specifically denied any serious medical
    problems including anxiety, depression, reading difficulty, [or] chronic pain.

17  AR 56-68, emphasis and internal citations omitted.

18                    **3.    Analysis**

19         The first step in assessing Plaintiff's subjective complaints is to determine whether

20  Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

21  alleged.  *Lingenfelter v. Astrue*, 504 F.3d at 1036.  The ALJ found that Plaintiff had a severe

22  combination of impairments including an obsessive compulsive disorder, a psychotic disorder,

23  not otherwise specified, and a torn meniscus of the left knee.  AR 55.  When making his finding

24  as to Plaintiff's RFC, the ALJ found that "[Plaintiff's] medically determinable impairments could

25  reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements

26  concerning the intensity, persistence and limiting effects of these symptoms are not entirely

27  credible." AR 57.  This finding satisfied step one of the credibility analysis.  *Smolen*, 80 F.3d at

28  1281-1282.

1    Because the ALJ did not find that Plaintiff was malingering, he was required to provide

2    clear and convincing reasons for rejecting Plaintiff's testimony. *Smolen*, 80 F.3d at 1283-1284;

3    *Lester v. Chater*, 81 F.3d at 834.  When there is evidence of an underlying medical impairment,

4    the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely

5    because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d at 343; SSR

6    96-7.  Moreover, it is not sufficient for the ALJ to make general findings; he must state which

7    testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v.*

8    *Shalala*, 12 F.3d 915, 918 (9th Cir.1993); *Bunnell*, 947 F.2d at 345-346.

9    In this case, the ALJ made approximately nine specific findings with regard to credibility

10   and Plaintiff's subjective pain complaints.  Those findings include:

11   1.    The lack of consistency between the Plaintiff's statements made to his physicians
12         and those contained in the record;

13   2.    The  statements made in materials submitted in connection with Plaintiff's
14         application for benefits, and statements made during his testimony at the hearing
15         that are inconsistent;

16   3.    The inconsistent statements made by Plaintiff in connection with his enlistment
17         into the United States Navy in 2004;

18   5.    The absence of clinical signs and laboratory findings in the medical record;

19   6.    The absence of longitudinal records showing regular contact with physicians or
20         attempts to obtain relief through the trial of a variety of different treatment
21         modalities without reasonable or credible explanation despite complaints of
22         disabling symptoms;

23   7.    The conflicting opinions of physicians attending Plaintiff during his enlistment
24         with the United States Navy in 2004 indicated that Plaintiff - aside from his knee
25         injury - was otherwise fit for service;

26   8.    The conflicting medical opinions of the examining and nonexamining physicians
27         in the record; and

28

21

9.     Plaintiff's failure to follow through with recommended treatment to address his left knee problem without reasonable or credible explanation despite complaints of severe left knee pain and limitation.

The ALJ provided specific, clear and convincing reasons for finding Plaintiff to be less than entirely credible. *Smolen v. Chater*, 80 F.3d at 1283-1284. Furthermore, the reasons provided are all proper factors to consider when assessing one's credibility. *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d at 638. The ALJ specifically identified testimony he found not credible. *Lester v. Chater*, 81 F.3d at 834.

ALJ Thompson made specific findings regarding Plaintiff's subjective complaints and did not rely solely on a lack of objective medical evidence. *See Dodrill v. Shalala*, 12 F.3d at 918; *Bunnell v. Sullivan*, 947 F.2d at 345-346. In evaluating the credibility of the symptom testimony, it is clear that the ALJ did consider all of the factors set out in SSR 96-7P and Title 20 of the Code of Federal Regulations sections 404.1529c(4)(i)(vii) and 416.929(c)(4)(i)(vii). *See Smolen v. Chater*, 80 F.3d at 1284; *Bunnell,* 947 F.2d at 346.

An ALJ's observations during an administrative hearing, along with other evidence, constitutes substantial evidence. *See Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th Cir. 1992). The ALJ may use "ordinary techniques" in addressing credibility. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996). Here, ALJ Thompson properly considered his observations during the administrative hearing, as well as other evidence, such as that relating to Plaintiff's military service. ALJ Thompson properly considered Plaintiff's reputation for truthfulness, prior inconsistent statements concerning his symptoms, and the testimony of Plaintiff that appeared less than candid, as well as unexplained or inadequately explained failure to seek treatment, failure to follow a prescribed course of treatment, Plaintiff's daily activities, work record, and the observations of treating and examining physicians. *Smolen*, 80 F.3d at 1284; *Orn*, 495 F.3d at 638. The ALJ properly assessed Plaintiff's credibility and subjective pain complaints.

1    Finally, Plaintiff is advised that even were this Court to find a few of the reasons the ALJ

2    provided to be error, and it does *not* so find here, an ALJ's credibility determination will be

3    upheld even though one reason may have been in error.  *See eg., Batson v. Barnhart*, 359 F.3d

4    1190, 1197 (9th Cir. 2004); *see also Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d

5    1155, 1162 (9th Cir. 2008) ("So long as there remains" substantial evidence supporting the ALJ's

6    conclusions on . . . credibility" and the error "does not negate the validity of the ALJ's ultimate

7    [credibility] conclusion" such is deemed harmless and does not warrant reversal").

8    In sum, the ALJ's findings regarding Plaintiff's credibility and subjective pain complaints

9    are supported by substantial evidence and are free of legal error.

10                                          **SUMMARY**

11    Plaintiff is advised that the mere diagnosis of an impairment is not sufficient to sustain a

12    finding of disability.  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985); *see also Matthews v.*

13    *Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of

14    disability).  It is an ALJ's responsibility to resolve conflicts in the medical evidence.  *Magallanes*

15    *v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Indeed, this Court must uphold the ALJ's decision

16    where the evidence is susceptible to more than one rational interpretation.  *Id.*

17                                         **CONCLUSION**

18    Based on the foregoing, the Court finds that the ALJ's decision is supported by

19    substantial evidence in the record as a whole and is based on proper legal standards.

20    Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

21    Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in

22    favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff

23    Zabian R. Crosby.

24

25    IT IS SO ORDERED.

26    **Dated:   March 18, 2011**                    **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE

27

28